UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
IN THE MATTER OF THE APPLICATION OF   :        18cv4255(DLC)
MAJOR MARKET RADIO, LLC, a Nevada     :
limited liability company, GOLDEN     :        OPINION AND ORDER
STATE BROADCASTING, LLC, a Nevada     :
limited liability company, and SILVER :
STATE BROADCASTING, LLC, a Nevada     :
limited liability company.            :
                                      :
------------------------------------- X
                                      :
RELATED TO                            :
                                      :
UNITED STATES OF AMERICA,             :        41cv1395 (DLC)
                                      :
                       Plaintiff,     :
                                      :
            -v-                       :
                                      :
AMERICAN SOCIETY OF COMPOSERS, AUTHORS :
AND PUBLISHERS,                       :
                       Defendant.     :
                                      :
------------------------------------- X

APPEARANCES:

For the Applicants:
Dariush Ghaffar Adli
Drew Harris Sherman
Jeremy Lee Ross
Adli Law Group P.C.
444 South Flower Street Suite 3100
Los Angeles, California 90071

For American Society of Composers, Authors, and Publishers:
Jay Cohen
Hallie Suzanne Goldblatt
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Richard H. Reimer
Jackson Paul Wagener
American Society of Composers, Authors, and Publishers

One Lincoln Plaza
New York, New York 10023

DENISE COTE, District Judge:

In August of 2012, the American Society of Composers, Authors, and Publishers ("ASCAP") terminated its licenses for three radio stations for the failure to pay licensing fees. Despite the lack of a license, the stations continued to play ASCAP music, and according to a jury's verdict this spring, engaged in willful infringement of copyrights held by ASCAP members. Almost six years after the termination of their licenses and only one week after the jury verdict, the stations applied to ASCAP for a license. ASCAP denied that application, contending that the stations must first pay outstanding licensing fees. The stations now seek an interim license from this Court, sitting as the ASCAP rate court. ASCAP has moved to dismiss this proceeding. For the following reasons, this proceeding will be dismissed on July 20, 2018 unless by that time the three radio stations pay to ASCAP $319,349.50 in outstanding fees indisputably owed.

## BACKGROUND

The parties have fully briefed ASCAP's motion to dismiss, submitting evidentiary materials with their briefing. The following facts are undisputed, except where noted.

<u>The ASCAP Consent Decree</u>

ASCAP is an unincorporated membership organization of music copyright holders created and controlled by music writers and publishers.  Its function is to coordinate the licensing of copyrighted musical works, and the distribution of royalties, on behalf of its nearly 500,000 members.  ASCAP licenses the public performance of musical works on behalf of the copyright holders to a broad array of music users, including television networks, digital music services, colleges, restaurants, and, most importantly for this case, radio stations.

Since 1941, ASCAP has operated under a consent decree stemming from an antitrust lawsuit brought by the Department of Justice.  The consent decree has been modified from time to time.  The most recent version of the consent decree was adopted in 2001 and is known as "AFJ2."  AFJ2 governs here.

Because ASCAP exercises monopoly power in the marketplace for music licenses, AFJ2 provides mechanisms to regulate ASCAP's issuance of licenses and the fees charged for them.  This dispute principally implicates three provisions of AFJ2.  First, AFJ2 provides that, subject to a key exception, "ASCAP is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory."  AFJ2 § VI.  The key exception, referred to here as the "Nonpayment Exception," is that "ASCAP

3

shall not be required to issue a license to any music user that is in material breach or default of any license agreement by failing to pay to ASCAP any license fee that is indisputably owed to ASCAP." Id. Second, AFJ2 provides a dispute resolution procedure in the event ASCAP and a prospective music user cannot agree on a reasonable fee for an ASCAP license. Either side may bring such disputes to a "rate court," which will then determine the appropriate fee. AFJ2 § IX. This Court is presently the ASCAP rate court. Third, AFJ2 prevents ASCAP from discriminating in pricing or with respect to other terms or conditions between "similarly situated" licensees. AFJ2 § IV(C).

The RMLC and ASCAP

Radio stations that wish to play ASCAP's copyrighted music must obtain a license from ASCAP. Most of the radio industry obtains its license for the public performance of ASCAP music through the Radio Music License Committee ("RMLC"), a trade association representing the industry. The RMLC negotiates with ASCAP on behalf of the stations that either agree to be actively represented by it, or bound by the results of its negotiations. These stations are collectively known as "Bound Stations."

The 2004 Agreement

In 2004, ASCAP and the RMLC came to an agreement to resolve a long-running negotiation to determine the rate the Bound

Stations would pay for ASCAP licenses.  The 2004 Agreement
provided for a total licensing figure payable to ASCAP by the
radio industry, which would then be apportioned under an agreed-
upon formula among each of the Bound Stations.

The 2004 Agreement had certain miscellaneous provisions
governing individual radio stations' licenses, such as the
inclusion of a 1%/month late payment charge for unpaid fees.
The 2004 Agreement also provided that

> In the event LICENSEE shall fail to make payment or
> submit any report under this Agreement when and as
> due, ASCAP may give LICENSEE thirty (30) days' notice
> in writing to cure such breach or default.  In the
> event the noticed breach or default has not been cured
> within thirty (30) days of receipt of said notice,
> ASCAP may promptly terminate this License.

Finally, the 2004 Agreement is to be construed and governed by
the laws of the State of New York, without regard for its
conflicts of laws rules.

The 2004 Agreement was approved by the then-rate court, the
Honorable William C. Connor.  As ordered by the Court, "[t]he
Court retains continuing jurisdiction over this proceeding for
the purpose of enforcing this Order and the terms, conditions,
and obligations of the ASCAP 2004 Radio Station License
Agreement."  Under that provision, ASCAP brought many
proceedings against radio stations who were delinquent in paying
their license fees.

At the expiration of the 2004 Agreement, the RMLC and ASCAP were initially unable to agree upon fees going forward. Pursuant to this Court's Interim Fee Order, the 2004 Agreement was extended on an interim basis until an agreement was reached. On January 27, 2012, an agreement was reached and so-ordered by this Court (the "2010 Agreement"). The 2010 Agreement covered licensing fees for the period January 1, 2010 to December 31, 2016. The 2010 Agreement left the Interim Fee Order rates in place for 2010-11. Unlike the 2004 Agreement, however, the 2010 Agreement calculated each radio station's fees for the years 2012-2016 based on a percentage of its revenues rather than as an overall Annual License Fee apportioned amongst the Bound Stations.

For calendar years 2012-2016, stations on blanket licenses agreed to pay ASCAP 1.7% of their "revenues subject to fee" -- amounting to their gross revenues less a 12% deduction. For calendar year 2012, each station was required to pay ASCAP on a monthly basis 70.9% of the monthly fees that the station paid in 2011. Upon the station's submission to ASCAP of an annual report of its revenues by April 2013 ("Annual Report"), ASCAP would either invoice the additional amount owed, if the monthly payments did not amount to the full license fees owed, or provide a credit (or refund if the amount was large enough) in

6

the event the monthly fees paid were in excess of the amount. If ASCAP did not receive a required Annual Report, however, then the monthly payments due for the following year were the amount of the previous year's monthly fees plus a 24% penalty until the Annual Report was received.

The 2010 Agreement also had certain miscellaneous provisions, such as the inclusion of a 1%/month late payment charge for unpaid fees. The 2010 Agreement also provided that

> In the event LICENSEE shall fail to make payment or submit any report under this Agreement when and as due, ASCAP may give LICENSEE thirty (30) days' notice in writing to cure such breach or default. In the event the noticed breach or default has not been cured within thirty (30) days of receipt of said notice, ASCAP may promptly terminate this License.

Finally, the 2010 Agreement is to be construed and governed by the laws of the State of New York, without regard for its conflicts of laws rules.

The 2010 Agreement was approved by this Court. As ordered by the Court, "[t]he Court retains continuing jurisdiction over this proceeding for the purpose of enforcing this Order and the terms, conditions, and obligations of the ASCAP 2010 Radio Station License Agreement." Under that provision, ASCAP brought many proceedings against radio stations who were delinquent in paying their license fees.

<u>The Applicants</u>

The applicants in this proceeding are Major Market Radio, LLC, Golden State Broadcasting, LLC, and Silver State Broadcasting, LLC ("Applicants").  Applicants control three radio stations at issue here: KRCK-FM in Palm Desert, California; KREV-FM in Alameda County, California; and KFRH-FM, in North Las Vegas, Nevada.  Each is a "Top 40" format radio station that broadcasts popular music.  Each is ultimately controlled by Edward R. Stolz II ("Stolz"), through one or the other of his companies.  It is undisputed that each station is a Bound Station under the terms of the 2004 Agreement, the 2010 Interim Fee Order, and the 2010 Agreement.

KRCK-FM was acquired by Playa Del Sol Broadcasters in 2001, a sole proprietorship owned by Stolz.[1]  Stolz acquired the FCC licenses for KFRH-FM and KREV-FM from the stations' prior owners through his company, Royce International Broadcasting Corporation ("Royce"), in September 2009.  The FCC licenses were then transferred to Applicants Silver State Broadcasting LLC and Golden State Broadcasting LLC, respectively, which are controlled by Royce, and through Royce, Stolz.

---

[1] Playa Del Sol remained the FCC licensee for KRCK-FM until 2016, when the license was transferred to Major Market Radio, which is controlled by Royce International Broadcasting Corporation, which is also controlled by Stolz.

When the Applicants acquired the two stations in 2009 they
made several changes.  For the station now known as KFRH-FM,
they changed the format of the station, moving it to a "Top 40"
station, changed the radio frequency it broadcast on, changed
the call letters from KCYE-FM to KFRH-FM, and changed the
branding of the station.  When Applicants acquired the station
now known as KREV-FM, it was then-broadcasting as KNGY-FM, and
played dance music.  The Applicants changed the call letters,
and changed the format of the station.  KREV-FM and KFRH-FM
received new licenses from ASCAP; although the station's prior
owners held ASCAP licenses for the stations, the Applicants did
not inherit those previously issued licenses.

The Applicants' Dealings with ASCAP: 2009-2012

After the 2009 acquisitions, the stations began paying
ASCAP irregularly or not at all.  KREV-FM never paid ASCAP any
licensing fees after it was acquired in 2009.  KFRH-FM made
irregular payments through August 31, 2010, although by that
point it had accumulated a large outstanding balance.  The
records of KRCK-FM's ASCAP account reflect that it routinely
incurred finance charges for late payment, and occasionally
collection costs.  The last time it paid ASCAP was on November
22, 2011 in the amount of $379, but by that point it had
accumulated $6,228.36 in outstanding fees and finance charges.

After ASCAP made efforts to obtain the amounts owed by the
stations, and those efforts having proven fruitless, on June 8,
2012, ASCAP sent the stations a pre-termination notice.  ASCAP
calculated the past-due balances as $190,000.81 for KFRH-FM,
$96,690.90 for KREV-FM, and $7,120.32 for KRCK-FM.[2]  The letter
stated that, if full payment was not received within the next 30
days, or the parties did not enter into a payment plan, the
licenses would be terminated.  Neither response nor payment were
forthcoming, and ASCAP provided notice to the Applicants on
August 21, 2012 that their licenses were terminated as of that
day.  Included in the notice was a warning that ASCAP would
monitor the stations and bring copyright infringement litigation
if they played ASCAP members' works.

The Infringement Litigation

After the termination of the Applicants' ASCAP licenses in
August of 2012, ASCAP monitored the radio stations.  On April 1,
2016, certain ASCAP members brought a complaint for copyright
infringement against Royce, Playa Del Sol, Silver State
Broadcasting, Golden State Broadcasting, and Stolz in the United
States District Court for the Central District of California.
The suit alleged that on eleven occasions, these stations
willfully infringed the ASCAP members' copyrights.  On June 21,

---

[2] The pre-termination notice also references KBET-AM, another
station controlled by Stolz, which is not a subject of this
proceeding.

10

2017, the Honorable Jesus G. Bernal granted the ASCAP members'

partial motion for summary judgment.  In particular, Judge

Bernal found that:

> Defendants fail to offer any evidence to refute that
> these broadcasts were unauthorized.  Defendant Radio
> Stations did not obtain licenses from ASCAP or seek
> permission from the copyright holders to publicly
> broadcast the songs.
>
> . . .
>
> Defendants raise the affirmative defense of "unclean
> hands", arguing that "[t]he failure of ASCAP to grant
> Defendants licenses on the fair and reasonable terms
> required by the consent decree and consistent with the
> negotiated radio industry licenses, despite
> Defendants' efforts to obtain licenses, cannot be held
> against these defendants."  But an expensive license
> fee would not excuse Defendants' infringement.  17
> U.S.C. § 106; see 17 U.S.C. § 501(a) (infringement
> occurs when alleged infringer engages in activity
> listed in § 106); A&M Records, Inc. v. Napster, Inc.,
> 239 F.3d 1004, 1013 (9th Cir. 2001).  Further, as a
> nonexclusive licensee, ASCAP is not a party to this
> action.  Accordingly, the alleged unreasonableness of
> ASCAP's fees is immaterial.  As such, the
> uncontroverted evidence, even when drawing all
> reasonable inferences in Defendants' favor,
> establishes Defendant Radio Stations' public
> performance of Plaintiffs' copyrighted works without
> authorization in violation of their exclusive rights
> under the Copyright Act.

WB Music Corp. v. Royce Int'l Broadcasting Corp., No. 5:16-cv-

600 JGB (DTBx), Dkt. 79 at 7 (C.D. Cal. June 21, 2017).

On March 13, 2018, a jury returned a verdict finding each

act of infringement to be willful, and setting damages at

$330,000.  On May 7, Judge Bernal entered a permanent injunction

precluding the Applicants, Royce, and Stolz from publicly

performing, or causing or permitting to be publicly performed, any copyrighted musical composition owned by the plaintiffs or in the ASCAP repertory without first obtaining proper authorization to do so.

One of the issues addressed in Judge Bernal's decision granting a permanent injunction was whether an injunction was appropriate in light of AFJ2. Judge Bernal found that:

> Moreover, as Plaintiffs note in their Reply, ASCAP is not required to issue a license to a music user in material breach and default for failing to pay ASCAP license fees. The Consent Decree § VI provides:
>
> > ASCAP is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory; provided, however, that ASCAP shall not be required to issue a license to any music user that is in material breach and default of any license agreement by failing to pay to ASCAP any license fee that is indisputably owed to ASCAP.
>
> In their sur-reply, Defendants argue that there is no amount indisputably owed ASCAP from 2009 to 2011 because Defendants contested whether they should be categorized as "new" or "existing" stations. However, the Court has already found that Defendants last paid licensing fees to ASCAP around August 2010, and that their ASCAP license was terminated in August 2012. Upon termination of Defendants' licenses, ASCAP found Defendants had failed to "cure the existing default." Even if the Court were to assume that Defendants' request to be treated as "new stations" created a dispute over licensing fees from 2009-2011, Defendants make no argument regarding the 2012 determination of fees. Thus, for at least a portion of the two-year period between August 2010 and August 2012, Defendants were in default and owed ASCAP license fees. Consequently, Defendants are not automatically entitled to an ASCAP license. In sum, Defendants' reliance on the Consent Decree is unavailing.

WB Music Corp. v. Royce Int'l Broadcasting Corp., No. 5:16-cv-
600 JGB (DTBx), Dkt. 186 at 4-5 (C.D. Cal. June 21, 2017).
Judgment was entered for plaintiffs on May 22, 2018.

The Instant Proceeding

On April 16, 2018, the Applicants made their first written
request for a license to ASCAP since the termination of their
licenses in 2012.  ASCAP replied on April 23, and refused to
issue the Applicants a license on the basis that they were in
material breach and default on their prior ASCAP licenses.

On May 11, Applicants filed this petition for determination
of interim license fees for the periods between September 14,
2009 - August 21, 2012 and from April 16, 2018 onward.[3]  ASCAP
responded to the petition on June 1.  ASCAP took the position
that the Applicants were not entitled to any ASCAP license
unless they paid the amounts due and owing under their prior
licenses.

This Court held a telephonic conference on June 8.  A
Scheduling Order of that day set a schedule first for a
determination of Applicants' eligibility for licenses, with the

---

[3] It is unnecessary to address in this Opinion whether a petition
brought under AFJ2 § IX is the appropriate method to visit the
amount of fees due to ASCAP in 2012 and earlier.  In any event,
it should be noted that AFJ2 requires ASCAP to treat similarly
situated music users identically.  Id. § IV(C).  It cannot
discriminate among them in setting fees.

motion to become fully submitted on June 26.  A June 26 Order granted Applicants' request to file a surreply, provided it was limited to "issues newly raised in ASCAP's reply that could not have been anticipated in opposing the original motion."  The Applicants filed a June 28 surreply which violated that Order. The Applicants then made several submissions after June 28, without authorization, to further argue that they were entitled to a license.  The last such submission was received on July 2, 2018.

In its submissions, ASCAP contends that it is owed $319,349.50. The Applicants acknowledge they must pay ASCAP something and suggest a payment amounting to $14,248.47.

The June 8 Scheduling Order also set a hearing to take place on July 19 on the request for an interim fee.[4]  This Court, however, advised counsel for Applicants on June 8 that:

> I may decide in connection with the briefing on the decree construction issue, Section VI of the consent decree, that to be entitled to an interim fee determination, your clients must have paid ASCAP a certain amount before the July 19 hearing.

On July 3, the parties advised the Court that they were in agreement that any licensing fee set for the period April 16,

---

[4] On June 12, Applicants requested permission to amend their application for interim license fees to include the period August 22 2012 to April 15, 2018 (the "Unlicensed Period"). This Court denied that application on June 13, 2018.  The June 13 Order also referred the parties to mediation.  The mediation took place on June 29, 2018, but failed to resolve the matter.

2018 going forward would be governed by the 2017 RMLC Agreement. The submissions made by the parties in anticipation of the contingently scheduled interim fee hearing largely repeat arguments presented on the eligibility of the Applicants to receive any new ASCAP license.

## DISCUSSION

Relying on the Nonpayment Exception of Section VI of AFJ2, ASCAP has moved to dismiss the Application for a determination of an interim fee. Its motion requires a construction of the Nonpayment Exception, which allows ASCAP to refuse to issue a license to an applicant already in material breach of an ASCAP license.

"Consent decrees are construed 'basically as contracts.'" Broadcast Music, Inc. v. DMX Inc., 683 F.3d 32, 43 (2d Cir. 2012) (quoting United States v. Broadcast Music, Inc., 275 F.3d 168, 175 (2d Cir. 2001)). "When the language of a consent decree is unambiguous, deference is paid to the plain meaning of the decree's language . . . . When the language of a decree is ambiguous, however, a court may consider, inter alia, extrinsic evidence to determine the parties' intent, including the purpose of the provision and the overall context of the decree." Id. "[A] consent decree is an order of the court, and thus, by its very nature, vests the court with equitable discretion to enforce the obligations imposed on the parties." United States

v. Local 359, United Seafood Workers, 55 F.3d 64, 69 (2d Cir. 1995).

Section VI contains the "core operative provision of AFJ2." Pandora Media, Inc. v. ASCAP, 785 F.3d 73, 76 (2d Cir. 2015). It requires ASCAP to grant any music user making a written request therefor a non-exclusive license to perform all the works in the ASCAP repertory. Section IX deals with disputes about the proper rate for that license. But Section IX presupposes entitlement to a license under Section VI in the first place. As recited above, Section VI contains the Nonpayment Exception. It states that "ASCAP shall not be required to issue a license to any music user that is in material breach or default of any license agreement by failing to pay to ASCAP any license fee that is indisputably owed to ASCAP."

The Nonpayment Exception does not appear in the earlier versions of the ASCAP consent decree. The Memorandum of the United States in Support of the Joint Motion to Enter Second Amended Final Judgment in the main proceeding, Civ. No. 41-1395 (S.D.N.Y. Sep. 5, 2000), explains that:

> Section VI of the AFJ2 requires ASCAP to offer a full-repertory license to any user upon request. The existing AFJ contains a similar provision, but in response to concerns raised by ASCAP, the AFJ2 includes new language designed to ensure that ASCAP need not license a music user "that is in material breach or default of any license agreement by failing

> to pay to ASCAP any license fee indisputably owed to
> ASCAP."

Accordingly, if a license applicant is in material breach of its prior ASCAP license due to a failure to pay fees that it had accumulated under that license, then the applicant is not entitled to a new license and the Section VI requirement to grant a license is no longer mandatory.

As a matter of decree construction, the Nonpayment Exception contains several elements. It refers to (a) a specific sum or specific amount in licensing fees (b) that the applicant previously failed to pay ASCAP. It requires further that the failure to pay was (c) a material breach or default of the applicant's ASCAP license and (d) that those amounts were indisputably owed to ASCAP. There is very little dispute that each of these elements is present here.

The Applicants held prior ASCAP licenses from 2009 to August 21, 2012, when the licenses were terminated by ASCAP. The Applicants owed licensing fees to ASCAP throughout that period and, as recited above, made no or minimal payments of the amounts due and owing. Those failures were material breaches of the licensing agreements, and the Applicants do not suggest otherwise.

Nor is there any reasonable dispute that the amounts owed to ASCAP by each Applicant were indisputably owed. The amounts were calculated pursuant to the formulae contained in the 2004

and 2010 Agreements, and the Applicants do not suggest that
ASCAP has erred in its calculation of the amounts owed pursuant
to each of those governing documents and their formulae.[5]

The Applicants present four arguments to escape dismissal
of their Application due to their prior material breach. None
has any merit.

First, the Applicants contend that so long as there is any
bona fide dispute over any portion of the fees due to ASCAP then
Applicants are entitled to an interim license while they apply
for a new license. Not so. So long as there is a material
breach from a failure to pay an amount of licensing fees

---

[5] ASCAP has made substantial productions to the Applicants before
and in this proceeding, including productions explaining how it
calculates the outstanding amounts due and owing to ASCAP on the
prior licenses. The Applicants have not availed themselves of
the many offers that ASCAP has made in connection with the
instant proceeding to meet with them and walk them through every
single component of the calculations. Nonetheless, in
opposition to this motion, the Applicants contend that they have
never been provided with the documents that explain how a
fifteen-year-old benchmark fee from 2003 is calculated. The
2003 Benchmark Fee is a component of the calculation of fees in
the 2004 Agreement, and, with exceptions not relevant here, is
simply the amount a station paid to ASCAP in 2003. As to KRCK-
FM, Applicants had many opportunities to challenge the amount of
the 2003 fee paid because Stolz or one of his companies owned
that station throughout the relevant period. As to the other
two stations, Applicants provide no reason to suggest that
ASCAP's billing of the prior owners, bills which the prior
owners paid, was somehow incorrect in any way. When Stolz
acquired the stations in 2009, he had a full opportunity at that
time to request further details on the ASCAP fee basis for the
stations. It is simply too late in the day to relitigate the
fees billed and paid in 2003 on nothing more than Applicants'
unsupported conjecture that there might have been an error in
those calculations.

indisputably owed ASCAP, then the existence of a bona fide
dispute over a separate amount of fees will not affect ASCAP's
ability to rely on the Nonpayment Exception.  This reading of
AFJ2 is consistent with its plain meaning.  The use of the word
"any" to modify "license fee," combined with the context of
"material breach or default of any license agreement," is a
strong textual indication that if any material portion of the
total license fee is indisputably owed, and has not been paid,
then ASCAP has no obligation to provide a license.  It is also
consistent with the only decision that had occasion to construe
the term "indisputably owed" in a closely related context.

    In Collins Court Music, Inc. v. Pulley, 704 F. Supp. 963,
967 (W.D. Mo. 1988), an ASCAP member sued a radio station as an
alleged infringer of its copyright.  The radio station had held
an ASCAP license, but after it failed to pay licensing fees,
ASCAP had terminated the license.  In resisting summary
judgment, the radio station argued that ASCAP was required by
the Amended Final Judgment, the predecessor to AFJ2, to provide
anyone who requests a license with a license.  In rejecting this
argument, the district court noted that the Southern District
rate court had approved an order addressing the RMLC license, an
order known as the "WGN Order".  The relevant portion of the WGN
Order reads:

    The provisions of this order shall not be construed as
    directing ASCAP to enter into any license agreement

> with any petitioner who, under the interim order
> herein or under prior license agreements, (a)
> indisputably owes any license fees to ASCAP . . . .

See id. (emphasis removed).  Relying on this provision and other rate court orders, the Collins court held that ASCAP is under no obligation to issue a license to any station that owes fees for earlier licensed periods.  Id.  Moreover, since it was not genuinely disputed that the radio station "owed some amount of license fees at the time their license agreement expired," as the defendant admitted he owed ASCAP between $200 and $330, ASCAP had not acted wrongfully in refusing to issue another license.  Id. at 966-67.

Next, the Applicants contend that the amounts which ASCAP asserts were owed by KREV-FM and KFRH-FM for 2009 to 2011 were not "indisputably" owed because ASCAP calculated those fees under the wrong formula.  The Applicants contend that they were entitled to the licensing fee formulas that apply to new stations.  This argument, which the Applicants have made previously, does not provide a reasonable basis for disputing fees.[6]

---

[6] Applicants made this argument to ASCAP at various points in 2011-12, and relied on it again in the infringement litigation in California.  As noted above, the jury found that the Applicants had engaged in willful infringement, despite their argument that there was a reasonable and good faith dispute over fees.  As Judge Bernal found, that was an implicit rejection of Applicants' position that they were engaged in a good faith dispute over fees.

The 2004 Agreement defines a new station as "[a]ny station newly licensed by the FCC in 2004 through 2009 and any station unlicensed by ASCAP prior to 2004." Under this definition, the Applicants' stations are not "new" stations. Applicants acquired their FCC licenses for KREV-FM and KFRH-FM from the prior holders. Neither station was "newly licensed" by the FCC. Nor were these stations "unlicensed by ASCAP prior to 2004." The Applicants bought existing stations that held not only FCC licenses but also ASCAP licenses. Changing the call letters of a station and/or the format of the station did not change the fact that the stations existed and were licensed by ASCAP when the Applicants acquired them. Nor does the fact that Applicants obtained their own ASCAP licenses after they purchased the two stations mean that the stations were "unlicensed by ASCAP prior to 2004." Accordingly, the contention that the Applicants' two stations are "New Stations" under the 2004 Agreement is easily dismissed. Raising this frivolous argument either now or in the past does not defeat ASCAP's showing that the Applicants indisputably owed the precise amounts it sought from them.

The Applicants' third argument applies only to the license fees owed for the year 2012. As described above, under the 2010 Agreement, licensees were required to make monthly payments to ASCAP in 2012, and by April of 2013 to submit their year-end 2012 revenue data to ASCAP. If the monthly payments had

resulted in an overpayment, the licensees were entitled to a refund; if an underpayment, the licensees were required to make up the difference. The monthly payments for 2012 were calculated based on the 2011 monthly fee payable to ASCAP. When the full year's revenue data was provided to ASCAP, the 2012 licensing fee would be set at 1.7% of the revenue (minus an additional adjustment), and the refund (or the additional amount due) would be calculated.

The Applicants did not make any monthly payments to ASCAP at any time during the year 2012 for any of the three stations. There is no dispute regarding the amount of monthly payments that they should have but did not make to ASCAP during 2012. It is these amounts that constitute the basis for ASCAP's calculations of the licensing fees indisputably owed by the stations for the year 2012 up until ASCAP terminated the licenses as of August 21, 2012. The Applicants do not suggest that they provided their 2012 full-year revenue data to ASCAP in April 2013 or at any time before then.

Despite this history, the Applicants appear to contend that they are now entitled to take advantage of the 1.7% cap on the 2012 licensing fee payments. It is too late to rewrite this history. ASCAP is correct that the Applicants have lost the right to take advantage of the 1.7% cap on the 2012 fees. They did not, as the 2010 Agreement required them to, either make

their 2012 monthly payments or report their 2012 revenues to
ASCAP.  Had they done so, the 2010 Agreement would have
permitted them to receive a refund if they had overpaid their
licensing fees.  The existence of that theoretical reimbursement
right does not alter the conclusion that the Applicants
indisputably owed the monthly licensing fee amounts in 2012 and
that they indisputably did not pay those amounts.

Finally, the Applicants contend that the $319,349.50 that
ASCAP now demands (a substantial portion of which is interest
and finance charges from Applicants' nonpayment of fees) is an
unconscionable and per se unreasonable sum in light of their
limited gross revenues.  Even if that argument were cognizable
in light of AFJ2 § IV(C), which prohibits discrimination in fee
schedules among similarly situated licenses, the fees requested
are not unconscionable.

Applicants were or should have been fully aware when they
purchased the two larger stations of their ASCAP fee basis.
There is no procedural unconscionability on these facts.  See
Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 10 (1988).  Nor
are the 2004 and 2010 Agreements substantively unconscionable.
That the Applicants were apparently disappointed by the revenue
streams from their stations did not entitle them to withhold the
licensing payments which permitted them to play copyrighted
music belonging the ASCAP members over those stations.  See id.

23

at 13-14 (unconscionability doctrine is for purpose of preventing oppression and unfair surprise, not to readjust the agreed-upon allocation of risks). On these facts, the only unconscionable and unreasonable behavior is that of the Applicants.

## CONCLUSION

ASCAP's June 15, 2018 motion to dismiss is conditionally granted. The interim fee hearing scheduled for July 19, and all briefing deadlines related to that hearing, will be adjourned sine die in an accompanying Order. Upon the payment to ASCAP of the $319,349.50 indisputably owed, a hearing schedule may be reinstated if there remains a dispute over the proper fee for an interim license. The Applicants having been on notice since at least June 8 of this potential result, this petition for a determination under Section IX shall be dismissed with prejudice on **July 20, 2018** unless Applicants pay $319,349.50 to ASCAP before that date.

SO ORDERED:

Dated:     New York, New York
           July 11, 2018

                                   _____
                                              DENISE COTE
                                   United States District Judge